Mabel Elliott, Appellant, v. Congress Hotel, Inc., Appellee.

Gen. No. 41,971.

288

Heard in the third division of this court for the first district at the October term, 1941. Opinion filed April 8, 1942. Rehearing denied May 7, 1942.

J. S. Pressman, of Chicago, for appellant.

George C. Bliss, of Chicago, for appellee.

Mr. Justice Hebel delivered the opinion of the court.

This is an action at law in tort instituted by Mabel Elliott against Congress Hotel, Inc., to recover damages for personal injuries sustained by her while a guest in a hotel conducted by the defendant in the city of Chicago at about 2:30 p.m. on the 30th day of December, 1936. The case was tried before a court and jury resulting in a verdict of not guilty in favor of defendant. The court overruled the plaintiff's motion for a new trial and entered judgment on the verdict, from which judgment this appeal is taken.

The plaintiff at the time of the accident was a visiting professor of sociology at the University of Minnesota. Prior to that time she was a professor of sociology at the University of Kansas and had taught at the latter school since 1929. From her statement of facts, it appears that she was the author of numerous books and articles in her field of sociology. At the time of the accident she was 38 years old and was engaged in writing a text book on public welfare. Her previous condition of health was excellent, with the ex-

ception of a minor sinus ailment which did not interfere with her work.

On December 30, 1936, Miss Elliott was attending the American Sociological Society Editorial Convention in Chicago and was a guest at the Congress Hotel. On that day she was dining in the "Pine Room" of the hotel with a Miss Edna Walther. She entered the room shortly after 1:00 o'clock in the afternoon and had been seated at a table for approximately an hour. While so seated, her room key fell to the floor and she stooped to pick it up. She arose from her chair and stooped to pick up the key, and, at that time, the waitress, employed by the defendant, without warning to the plaintiff, removed the chair, and as the plaintiff went to sit back on the chair she fell and struck her head against the juncture of a mirrored wall and a door jutting.

It appears that she was stunned and suffered acute pain in her head. She was assisted to her room by her dining companion, Miss Walther, and a bell boy. The hotel doctor was called and plaintiff was put to bed and an ice bag applied to her head. Plaintiff testified that everything appeared black to her; and later that evening the doctor ordered a nurse to remain with her throughout the night and the following day. The nurse kept ice bags on her head during that night and on the following morning. Plaintiff testified that her head "hurt terribly" and that she had the "sensation of ants crawling over her brain." The following morning her forehead was discolored from bleeding under the skin. She was very dizzy and remained in bed all morning with an ice bag on her head. She wanted to go to her home in Minneapolis and requested permission of the doctor to leave. She was given his permission and at the same time the doctor and the nurse demanded payment of their bills, which she refused.

The morning following the accident, an adjuster called upon her and after asking two friends of plaintiff to leave the room, questioned her concerning the accident, but did not discuss settlement. That afternoon the adjuster returned and advised plaintiff that the doctor said she would be alright and that he could not pay the doctor's bill or the nurse's bill if she did not sign "these papers" before she left the city. Plaintiff testified that he told her specifically that it would be impossible for him to pay anything after plaintiff "left the city"; that he told her "if you will sign this paper, I will pay the doctor's and nurses bill and give you $25.00 to cover your hotel expenses"; and that he did not read the paper to her, she did not read it herself, nor did he mention what the paper was, and when she signed it, the adjuster had it in his hands as she signed it.

Plaintiff was then assisted to a waiting car by Miss Murray and the nurse and driven to Miss Murray's home, where she was immediately put to bed. Ice bags were kept on her head and about 3:00 o'clock the next afternoon she was taken to the railroad station, assisted onto the train, and the conductor told to keep her ice bag filled. Her destination was Minneapolis, but because of her condition changed her destination to Sparta (half way to Minneapolis) where she had some friends. At Sparta she proceeded to the home of her friends and was put to bed and still required ice bags to her head. After several days she went by train to Minneapolis. The next day after arriving in Minneapolis, she called a Dr. Sweetser, which was on January 4, 1937, five days after her mishap. She further testified that the pain in her head at that time was terrific and that she saw Dr. Sweetser 45 or 50 times.

She went back to the University in January of 1937, but only carried one third of her normal load, and further testified that she did not get back to the Uni-

versity of Kansas until February 1938, and found that teaching still exhausted her and she continued to have severe headaches. She began to improve in the Fall of 1938, and at the time of the trial she was much improved, although more nervous than prior to the accident.

Constance Raymaker testified that she was an associate professor of Economics at Ripon College; that at the time of the accident she was in Chicago attending the Convention of the American Economics Society; that she was called to the plaintiff's hotel on the date of the accident and got there some time after 4:00 o'clock and found the plaintiff very confused, almost incoherent. At 7:30 that evening, she testified, the plaintiff was definitely hysterical and very wobbly. Ice bags were applied to her head while she was there that evening. Edna Walther, called as a witness on behalf of plaintiff, testified that she was a school teacher of an intermediate school in Chicago Heights, Illinois, for 12 years; that she lunched with the plaintiff at the time of the accident; that the plaintiff dropped her key to the floor and as she stooped down to pick it up, the waitress stepped up and removed the chair; that the plaintiff put her hand back to touch the chair, but the chair not being there, lost her balance and fell back and her head struck the wall; and that the plaintiff was stunned and apparently senseless for a moment. The witness assisted plaintiff to her room. According to her testimony, the plaintiff at that time was nervous, dazed and incoherent, and incoherent in her conversation.

Marguerite Murray, a child welfare worker, employed by the Children's Aid Society of Racine, Wisconsin, testified that she saw the plaintiff December 30, 1936. At that time she was in bed hysterical or semihysterical and she was groaning about pains in her head. The witness testified that "she would start one sentence and not complete that, then she would

start talking about something else and she was highly excited and incoherent.'' She further testified that the next morning the doctor came in with another man and they had some personal business to discuss with plaintiff and asked Miss Raymaker and this witness to leave the room, which they did. The witness returned to the hotel after lunch, at which time the plaintiff asked the witness to check out for her and was given a check which she took to the hotel desk and paid her bill. There were a few dollars left out of the check. The bill was between sixteen and twenty dollars. She then helped plaintiff down to the car, and plaintiff was immediately put to bed upon arrival at the witness' home and an ice bag applied to her head. The next afternoon, plaintiff was assisted to the train, and as far as the witness knew she went to Minneapolis.

Dr. Horatio Sweetser, Jr., a licensed physician practicing medicine and surgery in the State of Minnesota since 1924, testified that he examined plaintiff on January 4, 1937. He found a slight discoloration of the scalp over the right temple, indicating a fading subcutaneous hemorrhage; that plaintiff was quite nervous, quite fidgity, not well controlled; that there were three positive findings—discoloration in her scalp, increased knee jerks, general nervousness, almost semihysterical. He further testified ''my impression was that a few days before my examination on January 4, 1937, she had had a concussion of the brain''; that she was disabled from January 4, 1937 and on for a considerable time. On January 21, 1937 she was still very nervous and upset, and that she was disabled up until February 1, 1937. He discontinued seeing her on June 7, 1937 when he sent her to Dr. Albert M. Snell of the Mayo Clinic. During the period between January 4, 1937 and June 7, 1937, he treated her for various disabilities, headache, low-grade fever, indigestion, abdominal distress and hives.

Dr. Snell testified that he had been a practicing physician and surgeon at Mayo Clinic for over 16 years; that he first saw plaintiff professionally on June 5, 1937 at the clinic; that he made the usual tests and on June 17, 1937 his diagnosis was exhaustion syndrome with nervous and mental instability or neurosis. As to the type of neurosis, the doctor testified that there was a background of injury and a background of infection and one had no positive way of determining whether either one alone or both acting together were responsible for the patient's condition. He testified "the fact is she said she had been well up to the time of the injury and thereafter never regained her health."

Dr. Victor E. Gonda, a specialist in nervous and mental diseases, testified that on December 9, 1940, shortly before the trial he made a neurological examination of plaintiff and diagnosed her condition at that time as a traumatic neurosis, which is any nervous condition that develops after some individual sustains a trauma; and that exhaustion syndrome was just another medical term for neurosis.

Dr. John W. Foster testified for the defendant that he saw the plaintiff about an hour after the accident and prescribed ice bags to the side of her head and aspirin for her headache. He did not see any bruises on her head. He made five or six calls in all and rendered her a bill for $15 and advised her that it was all right to leave for home. He saw nothing in her conversation that showed any disorientation at all. He further testified that she complained of a lot of pain and was excited. He called Miss Brown, the nurse, to attend her throughout the night and the next day. He took no X-rays and told her not to bother about it until she got home.

Miss Brown, the nurse, a witness on defendant's behalf, testified that at the time of the trial she was a radio broadcaster; that when the witness came to see the plaintiff the night of the injury, the plaintiff was

rational, and that the next morning her mental condition was rational and her conversation was coherent; that a representative of the insurance company visited the plaintiff in the morning after the injury and in a conversation stated that $75 was a little too much, but would talk it over with someone and see what he could do for the plaintiff; that the representative came back later after plaintiff had dressed herself and she affixed her signature as a witness to defendant's exhibits 2 and 3; that the plaintiff read these documents, and that she was quite rational at the time. She was paid $10 for her services by Dr. Foster.

It appears on the cross-examination that she did not discuss this case until two years later when a representative of the insurance company came to see her. That at this conversation, she referred to a chart that she had made of the plaintiff's case; that she forgot about the plaintiff during the two-year period; that the record she made contained the various conversations she had with the plaintiff; that she destroyed the records and did not turn them over to the insurance company.

The adjuster, Jerry B. Howard, testified that he saw plaintiff on December 31, 1936; that when interviewed concerning the accident, she appeared perfectly normal as far as her mental condition was concerned; that she read the memorandum he made of her replies to his questions and refused to sign it; that she wanted $75 and her doctor's and nurse's bills and wanted to see the doctor first to see if she could go home that day. That he came back in the forepart of the afternoon; that she decided to take $25 for herself and an additional $25 for the doctor and nurse; that he handed her the release and took it for granted she was reading it; and that she signed the releases, after he called the nurse over to act as a witness to plaintiff's signature. On cross-examination he testified

that he always carried releases and drafts and was in a position to settle a case right on the spot immediately; that he knew at that time that Miss Brown was the nurse for plaintiff; and that he did not know the extent of her injuries, and at no time did he inquire as to the extent of her injuries from any one.

The plaintiff contends that the verdict of the jury in the instant case is contrary to the weight of the evidence; and that there is no evidence whatsoever to sustain the verdict or the judgment with respect to the negligence issue of the case, and that as to the release issue the evidence to say the least was highly conflicting and close, thereby making it essential for the court to use extreme care in instructing the jury. However, when we come to consider the issue that was before the court and jury as to the release that was signed by plaintiff, the position of plaintiff concedes that the evidence was "highly conflicting and close." Plaintiff points to the testimony of Miss Elliott and Miss Raymaker as showing that plaintiff was not in possession of her full faculties at the time of signing the release, and that the adjuster took advantage of her physical condition and anxiety to return to Minneapolis. Plaintiff further says that " . . . we were not so presumptious as to say that the weight of the evidence of the release was manifestly in favor of the plaintiff. It is true the defendant introduced three witnesses, Dr. John W. Foster, Miss Kathryn Brown and Jerry B. Howard who all testified that the plaintiff was perfectly normal as far as her mental condition was concerned and according to the witnesses, Miss Brown and Mr. Howard, she read the releases before she signed them and knew perfectly well what she was doing." It is contended that, therefore, it became mandatory upon the court to instruct the jury correctly and not to confuse them and give them an instruction which would in no way assist them in

arriving at a proper verdict. In support of plaintiff's theory, the case of *Wallace v. Parnell,* 306 Ill. App. 310, is quoted, where the court said:

"Where the evidence is conflicting and the case is a close one on the facts, great care should be taken in properly instructing the jury, and the failure so to do constitutes reversible error."

The result of this suggestion of plaintiff is that this court must consider whether the trial court committed reversible error in giving an alleged prejudicial instruction to the jury at the request of defendant. Plaintiff contends that instruction No. 19, tendered by defendant and given by the court over plaintiff's objection, introduces a theory of "mere accident" when there is no basis in the evidence for such a theory. This instruction is as follows:

"The court instructs you that if you believe from the evidence under the instructions of the Court that the injury to the plaintiff was a result of a 'mere accident' which occurred without negligence on the part of the defendant as charged in the complaint, you should find the defendant not guilty." It is contended that the vice of this instruction is in the fact that it injects the possibility that the injury resulted from "mere accident," without negligence, something entirely foreign to the record. In reply, the defendant points out that it is not shown in the record and abstract that this instruction was given at the request of defendant, and urges that since it is nowhere shown in the record or abstract who requested any of the instructions, this court must presume that plaintiff requested the giving of the instruction complained of unless she preserves a record to the contrary. Without waiving the point, the defendant goes on to discuss the instruction in question, contending that the trial judge committed no error in giving it, regardless of who requested it. The cases cited by plaintiff are con-

tended to be either not in point or distinguishable. In *Peters v. Madigan,* 262 Ill. App. 417, there was a right angle collision between automobiles, and the court held that there was no evidence in the record which tended to show the collision was the result of mere accident and that there must be evidence upon which to base the instruction. While the instruction was criticized, still the court did not hold that the giving of such an instruction amounted to reversible error, but reversed and remanded the case, holding that another instruction amounted to reversible error. Defendant goes on to criticize *Streeter v. Humrichousé,* 357 Ill. 234, and quotes from the opinion as follows;

''Turning to the instructions, the fifteenth instruction told the jury that if the death of the decedent was caused through 'accident purely' they should find the defendant not guilty. There was no evidence that McGann was injured through accident, alone, not coupled with negligence and it was error to give this instruction.'' It is pointed out that this case was reversed and remanded on other grounds, and further that the instruction given in that case does not appear to be the same as the instruction in the instant case, which told the jury that if the injury to plaintiff was the result of a mere accident which occurred ''without negligence on the part of the defendant as charged in the complaint,'' they should find the defendant not guilty. In the instant case there are reasonable inferences from the undisputed facts surrounding the occurrence, that plaintiff's fall was due to a mere accident and without negligence on the part of defendant (as denied in defendant's answer). In *Mississippi Lime & Material Co. v. Smith,* 282 Ill. App. 361, cited by plaintiff, the court found that the injuries to deceased were clearly the result of negligence of the defendant, and the instruction referred to by plaintiff

is not set forth in the opinion. Therefore, the authority would not seem to apply to the facts as they appear in this record. It is contended by defendant that the trial court committed no error in giving this instruction, and urged that under the peculiar facts of this case, it would have been reversible error for the court to have refused to give it. In *City of Chicago v. Lavelle,* 83 Ill. 482, where the plaintiff sought to recover damages for an injury claimed to have resulted from a hole in the sidewalk where there was evidence that the walk was in good condition, the refusal of the court to instruct the jury, that, if they believed from the evidence that the alleged injury was accidental, and that neither the plaintiff nor defendant was negligent, they should find for the defendant, was held error. It was there said in reference to the instruction that:

"If it be true that the city was free from negligence, as the evidence introduced on the part of the defense tended to establish, and if it was also true that the injury was accidental, no argument is needed to show that the city could not be held responsible for the damages Appellee had received. We perceive no objection to the instruction. The principle therein announced is correct, and it should have been given." To the same effect is *Brown v. Richardson,* 177 Ill. App. 488. In *Bentkowski v. Bryan,* 299 Ill. App. 217, it appears that an instruction was given almost identical to that given in the instant case. There was a verdict in favor of defendant, and it was contended that the giving of the instruction was reversible error. The court held that as there was evidence tending to show that defendants were not guilty of any negligence, it was not error to give this instruction, saying:

"It is a well settled rule of law that each side in any litigation is entitled to have the jury instructed relative to the theory of the law upon which the case is tried." Then again, in *Oliver v. Kelley,* 300 Ill. App.

487, where the court refused to give the following instruction:

"If you believe from the evidence that the alleged injury to the said Mary Ellen Oliver was accidental and that neither the plaintiff nor the defendant was negligent, you should find the defendant, Thomas O. Kelly, not guilty." The Appellate Court held that the refusal to give this instruction was error in view of the close character of the case upon the facts. In the instant case, there does appear to be a reasonable inference from all the facts that the fall of plaintiff was not due to any negligent or careless act on the part of the defendant, and there was no presumption of negligence from the mere happening of the occurrence. (*Barnes v. Danville Street Railway & Light Co.*, 235 Ill. 566.) One of the issues submitted to the jury was whether or not defendant was guilty of negligence and it would appear as we consider the facts, that the court committed no error in giving instruction No. 19 to the jury.

As we have already indicated, there were two separate and distinct issues submitted to the jury; the first involving whether or not defendant was guilty of any negligence, and the second the affirmative defense of settlement and release of plaintiff's claim. Neither had any relation to the other. It appears that the trial court reserved its ruling upon the motion for a directed verdict at the close of all the evidence. The evidence disclosed that plaintiff accepted the draft and cashed same, which draft constituted a release of all claims, and which was a ratification of the settlement entered into, regardless of whether or not plaintiff read the releases she signed. From all the facts appearing in evidence, we are of the opinion that the trial court was fully justified in entering judgment on the verdict. From the record it does not appear that defendant committed any fraud which impelled plaintiff to sign the releases. On the contrary, upon

examination of the releases, it appears in words of large type on the face of these releases at the top "Release of all Claims" and at the bottom "Caution, Read Before Signing." These words would readily catch the eye of the person signing such releases and should have given sufficient notice of the character of the paper which she was signing. No evidence was introduced to indicate that the adjuster told plaintiff that the paper he asked her to sign was not a release. This is borne out further by the fact that the adjuster gave her a draft, which by its language on the reverse side, was notice to plaintiff that the endorsement and cashing of the draft constituted a complete and full release of her claim.

We are of the opinion that the verdict of the jury was not contrary to the weight of the evidence, and under the facts as submitted to this court, we are of the opinion that the court did not err in denying plaintiff's motion for new trial and was justified in entering judgment on the verdict.

*Judgment affirmed.*

BURKE, P. J., and KILEY, J., concur.